**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| BRENDA LEE MELTON,         ) | |
|                             ) | |
|         **Plaintiff,**       ) | |
|                             ) | |
| **v.**                         ) | **No. 2:15-00062** |
|                             ) | **Judge Sharp/Brown** |
| CAROLYN W. COLVIN,     ) | |
| ACTING COMMISSIONER   ) | |
| OF SOCIAL SECURITY,      ) | |
|                             ) | |
|         **Defendant.**     ) | |

**To: The Honorable Kevin H. Sharp, Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner, denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(I) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 11) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY[1]

Plaintiff applied for DIB on June 6, 2012, alleging a disability onset date of December 24, 2011.[2] Plaintiff claimed she was unable to work due to high blood pressure, right shoulder problems, loss of memory, and arthritis. (Doc. 7, p. 155) Plaintiff's applications were denied initially on August 22, 2012, and upon reconsideration on November 8, 2012. Plaintiff requested

---

[1] The procedural history that follows is adopted from the jurisdiction and procedural history section of the Administrative Law Judge's (ALJ) decision (Doc. 6, p. 15), unless indicated otherwise.

[2] References to page numbers in the administrative record (Doc. 7) are to the page numbers that appear in bold in the lower right corner of each page.

a hearing before an ALJ on November 16, 2012. A video hearing was held January 21, 2014. Plaintiff was represented at the hearing by attorney Donna Simpson.

The ALJ entered an unfavorable decision on May 16, 2014 (Doc. 7, pp. 12-32), after which plaintiff filed a request with the Appeals Council on June 6, 2014 to review the ALJ's decision (Doc. 7, pp. 10-11). The Appeals Council denied plaintiff's request on September 23, 2015 (Doc. 7, pp. 1-5), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action through council on October 27, 2015 (Doc. 1), following which she filed a motion for judgment on the administrative record on April 25, 2016 (Doc. 11). The Commissioner responded on May 23, 2016. (Doc. 13) Plaintiff did not file a reply. This matter is now properly before the court.

## II. EVIDENCE[3]

### A. Medical Evidence

Plaintiff was admitted to the Cookeville Regional Medical Center (Cookeville Regional) emergency room (ER) on November 24, 2011 with altered mental status, disorientation, slurred speech, etc. (Doc. 7, pp. 554-70) A CT scan of plaintiff's head revealed "[n]o acute intracranial pathology," *i.e.*, it was a "[n]ormal CT scan head . . . for the patient's age." (Doc. 7, p. 567)

Plaintiff was transferred from the Cookeville ER to St. Thomas hospital in Nashville on November 24, 2011. (Doc. 7, pp. 492-517) The impression from a brain MRI performed at St. Thomas showed "[s]cattered periventricular and subcortical white matter lesions . . . most consistent with small vessel disease in a patient of this age. Otherwise negative noncontrast MRI brain." (Doc. 7, pp. 492, 502-03) The St. Thomas records note that plaintiff's family stated plaintiff's problems

---

[3] The following excerpts from the administrative record are those necessary to respond to plaintiff's motion for judgment on the administrative record. The remainder of the record is incorporated herein by reference.

may have stemmed from having taken her husband's medications by mistake.  (Doc. 7, pp. 492, 495-96)  Plaintiff was discharged on November 25, 2011 with a final diagnosis of "Encephalopathy,[4] likely due to the medication side effects . . . ."  (Doc. 7, p. 492)

Dr. Anthony Carter, M.D., admitted plaintiff to Cookeville Regional on December 29, 2011 for additional imaging studies.  (Doc. 7, p. 553)  A brain MRI with and without contrast revealed "minimal supratentorial[5] white matter chronic microvascular[6] ischemic[7] changes," and a "[s]uspected tiny . . . right planum sphenoidale meningioma[8]"; however, the final impression from the brain MRI was "[n]o acute intracranial pathology."  (Doc. 7, pp. 544-45)  An ultrasound of plaintiff's carotid arteries revealed "[n]o hemodynamically[9] significant carotid arterial stenosis in the neck."  (Doc. 7, p. 543)  The echocardiogram was unremarkable.  (Doc. 7, pp. 527-28)

Plaintiff presented to Dr. Carter eight times in 2012 for fatigue, confusion, low back pain, memory loss, blood pressure problems, unsteadiness, and/or hypoglycemia.  (Doc. 7, pp. 687-98, 729-35)  Dr. Carter referred plaintiff for an endocrinology evaluation on June 26, 2012.  (Doc. 7, pp. 692-93)

---

[4]  Encephalopathy – "any degenerative disease of the brain."  *Dorland's Illustrated Medical Dictionary* 614 (32nd ed. 2012).

[5]  Supra tentorial – "superior ['situated above'] to the tentorium ['an antomical part resembling a tent or a covering'] of the cerebellum [the part of the brain 'concerned in the coordination of movements']."  *Dorland's* at pp. 332, 1804, 1806, 1883.

[6]  Microvascular – "the portion of the vasculature ['pertaining to . . . blood vessels'] of the body comprising the finer vessels, sometimes described as those with an inner diameter of 100 microns or less."  *Dorland's* at pp. 1164, 2026.

[7]  Ischemia – "deficiency of blood . . . usually due to functional constriction or actual obstruction of a blood vessel."  *Dorland's* at p. 961.

[8]  Planum sphenoidale meningioma – "slow-growing tumors" that may "cause displacement of the optic apparatus resulting in visual disturbances."  Http:// neurocirguiga.com/2016/08/11/update-planum-sphenoidale-meningioma/.

[9]  Hemodynamic – "pertaining to the movements involved in the circulation of the blood."  *Dorland's* at p. 839.

Endocrinologist Dr. James Gaume, M.D., examined plaintiff on July 25, 2012. (Doc. 7, pp. 627-33) Laboratory studies were normal. Dr. Gaume reported, *inter alia*, that plaintiff reported "[s]he does not get lost driving . . . ." (Doc. 7, p. 627) Dr. Gaume also reported that he had "no further investigation to offer her." (Doc. 7, p. 628)

Tennessee Disability Determination Services referred plaintiff to B. Kathryn Galbraith, Ph.D., Licensed Clinical Psychologist, for a clinical interview, Mental Status Examination, and review of the records. The evaluation took place on August 6, 2012. (Doc. 7, pp. 579-584) Plaintiff "was the sole informant for the interview." (Doc. 7, p. 579) Plaintiff represented the following in the review of activities of daily living (ADL): 1) she managed her medications "with no difficulty"; 2) she managed her finances "with little or no difficulty"; 3) she knew how to prepare meals; 4) "she could wash dishes, vacuum, sweep, do laundry, and do yard work "if needed"; 5) she drove "once or twice a week for short distances"; 6) her husband was "afraid she w[ould] forget where she [wa]s going," and that it is easier for her to say that "he [wa]s worried about her memory problems than it [wa]s for her to acknowledge them." (Doc. 7, p. 583) Dr. Galbraith also reported that plaintiff "displayed a normal gait," that she claims "she forgets where she's going when she is driving and has to call her husband . . . at least once a week." (Doc. 7, pp. 580, 582) Dr. Galbraith noted the following at the conclusion of the evaluation:

> Ms. Melton . . . showed evidence of moderate impairment in her short term memory function. She showed no evidence of impairment in her concentration abilities on the Mental Status Exam, but observed behavior in the interview suggested mild impairment in that area. She showed no evidence of impairment in her long-term and remote memory functioning.

(Doc. 7, p. 583)

Dr. Rebecca Joslin, Ed.D., completed a mental RFC evaluation of plaintiff on August 21, 2012. (Doc. 7, pp. 589-605) Dr. Joslin reported, among other things, that plaintiff's understanding

and memory were not significantly limited.  (Doc. 7, p. 589)

Neurologist Dr. Deka Efobi, M.D., examined plaintiff on September 26, 2012 on referral from internist Dr. Kimberly Eakle, M.D.[10]  (Doc. 7, pp. 701-709)  Dr. Efobi's report included the following observations: 1) no musculoskeletal defects, tenderness, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs or pelvis; 2) "recent memory preserved, remote memory intact"; 3) normal attention span and concentration; 4) no cognitive dysfunction; 5) motor strength 5/5 bilaterally in both upper and lower extremities; 6) reflexes 2+ bilaterally in the upper and lower extremities; 7) able to tandem walk, toe and heal walk, stand on alternate limbs; 8) MMSE 28/30 deficits in orientation and recall.[11]  Dr. Efobi noted that plaintiff complained of left shoulder pain, and concluded by noting she "believe[d] that depression may be contributing to the dementia . . . ."  (Doc. 7, pp. 702-03)

Dr. Efobi saw plaintiff in a followup visit on November 6, 2012.  (Doc. 7, pp. 751-53)  Dr. Efobi's second report was unchanged from her first one, including plaintiff's complaint of left shoulder pain.  (Doc. 7, p. 752)  Dr. Efobi noted additionally that plaintiff's "tail bone [wa]s sore" because she fell the week prior after tripping over a broom.  (Doc. 7, p. 751)  Dr. Efobi also noted that plaintiff required neuropsychological testing for her alleged memory problems.  (Doc. 7, p. 752)

Dr. Frank Kupstas, Ph.D., completed a second mental RFC on November 7, 2012.  (Doc. 7, pp. 711-27)  Dr. Kupstas determined that plaintiff had moderate limitations in her ability to understand and remember detailed instructions, but otherwise her memory and ability to understand

---

[10]  Dr. Eakle treated plaintiff seventeen times from June 27, 2011 to January 23, 2014.  (Doc. 7, pp. 481-86, 612-17, 622-24, 779-95, 862-70, 954-56, 965-70)  She is a treating physician under the regulations, whose reports are the subject to plaintiff's first claim of error.  Dr. Eakle is identified as Dr. Eakle-Gerald in later records.  However, she will be referred to as Dr. Eakle in this R&R for the sake of uniformity.

[11]  A score equal to or greater than 24 points out of 30 indicates normal cognition.  Https://www.mountsinai.on.ca/care/psych/on-call-resources/on-call-resources/mmse.pdf.

were not significantly limited.  (Doc. 7, p. 711)

Dr. Eakle completed a document captioned, "MEDICAL SOURCE STATEMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)" on November 30, 2012.  (Doc. 7, pp. 824-27)  Dr. Eakle opined that plaintiff was "incapable of even 'low stress jobs.'"  (Doc. 7, p. 825)

Plaintiff was referred by Dr. Eakle to neurologist Dr. Thuy Ngo, M.D., who examined plaintiff on December 5, 2012.  (Doc. 7, pp. 821-22)  Dr. Ngo noted "minimal chronic microvascular changes" in the previous brain MRI, he did "not appreciate a right subfrontal memingioma," he saw "no lesion with significant mass effect," plaintiff's symptoms were "not consistent with dementia of the Alzheimer type," and he did "not appreciate the presence of a brain tumor . . . ."  (Doc. 7, p. 822)  Dr. Ngo noted that plaintiff's recent and remote memory were "fairly good," and that her "[s]tation, coordination and gait [we]re intact."  (Doc. 7, p. 822)  He also opined that plaintiff's alleged memory issues could be due to a "significant underlying anxiety disorder."  (Doc. 7, p. 822)

Plaintiff presented for treatment to neurologist Dr. Ikuko Laccheo, M.D., on January 10, 2013 (Doc. 7, pp. 834-37) on referral from Dr. Eakle (Doc. 7, p. 927).  Dr . Laccheo noted the following in his examination: Motor exam power 5/5 bilaterally. . . .  Reflexes: 2/2 symmetrically. . . .  Gait and Station: within normal limits.  Difficulty with tandem/heel walk, but able to walk on toes. . . .  Involuntary movements: none."  (Doc. 7, p. 836)  Dr. Laccheo also noted that plaintiff's December 24, 2011 brain MRI "show[ed] no acute abnormality," and that plaintiff claimed to have fallen a "few months ago, because [of] feeling off balance."  (Doc. 7, p. 834)

Dr. Leccheo ordered a brain MRI with and without contrast, as well as an EEG.  (Doc. 7, p. 836)  Dr. Laccheo noted the following in his letter to plaintiff dated January 11, 2013 concerning the  brain MRI the day before: "MRI of the brain with and without contrast . . . did not show any

acute abnormality, other than showing previously seen right cribiform plate meningioma . . . . Also noted on previous MRI of December 2011, small vessel ischemic changes (chronic) in the white matter, and bilateral maxillary sinusitis. . . ."  (Doc. 7, p. 833)  The EEG was normal.  (Doc. 7, p. 846)

Dr. Eakle completed a second physical MSS on March 12, 2013 (the second MSS).  (Doc 7, pp. 828-31)  The second MSS was essentially the same as the first, with the following exceptions.  Dr. Eakle wrote the following in support of the assessed exertional limitations: "Memory loss – MRI, new evaluation," and "OA [osteoarthritis] – plain [*sic*] C[cervical]spine."[12]  (Doc. 7, p. 829)  Dr. Eakle wrote the following in support of plaintiff's assessed environmental limitations: "OCC [occasional] exacerbation requires sedatory [*sic*] meds  (Flexeril, Lortab that hinder work capacity)  Also issues [*sic*] c [with] memory affect[s] ability.  Sx [symptoms] cont[inue] to worsen and mobility declining."  (Doc. 7, p. 831)

Neuropsychologist Gary Solomon, Ph.D., performed a neuropsychological evaluaiton of plaintiff on April 8, 2013 on referral from Dr. Laccheo.  (Doc. 7, pp. 957-61)  Dr. Solomon's diagnostic impression was: "A synthesis of neuropsychometric[13] and clinical data raise the question of a pseudodementia, multifactorial in nature."  (Doc. 7, p. 961)(bold omitted)  Dr. Solomon also noted that the results of the tests were positive for "suboptimal effort," and that the results should be "viewed with caution" because of their "questionable validity."  (Doc. 7, pp. 959, 961)

Dr. Leccheo wrote the following to plaintiff on April 9, 2013 after plaintiff was examined by Dr. Solomon:

---

[12]  The words followed by "[*sic*]" in this explanation, and those quoted below, are indecipherable.  The Magistrate Judge has had to used his best guess.

[13]  Neuropsychometric – "pertaining to the quantitative testing of neurological processes underlying congnitive processes and behaviors."  *Dorland's* at p. 1270.

> Neuropsychological testing . . . per Dr. Solomon . . . showed findings concerning for a possibility of pseudodementia. This means that there are other medical or psychological factors that may be mimicking dementia-like symptoms. Dr. Solomon felt most likely multifactorial, including undertreated psychiatric condition (for instance depression). . . .

(Doc. 7, p. 832) Dr. Laccheo saw plaintiff again on May 29, 2013. (Doc. 7, pp. 901-04) Dr. Laccheo recorded the following in his consultation notes with respect to plaintiff's alleged memory problems: "Less likely MRI (meningioma) contributing to this picture (and most likely incidental)," and "no change" in a brain MRI performed on January 10, 2013 from the November-December 2011 MRIs. (Doc. 7, p. 904)

Neurologist Dr. E. Frank Lafranchise, M.D., treated plaintiff on December 9, 2013. (Doc. 7, pp. 962-63) Plaintiff's neurological examination was as follows: "Motor exam power 5/5 bilaterally. . . . Reflexes: 2/2 bilaterally. . . . Gait and Station: within normal limits, walks in tandem. Involuntary movements: none." (Doc. 7, p. 963) A brain MRI performed that same day showed that "there d[id] not appear to be any significant change when compared with the prior study of January 10, 2013." (Doc. 7, p. 964) Dr. Lafranchise treated plaintiff again on June 24, 2014. (Doc. 7, pp. 972-75) Dr. Lafranchise noted in reference to the "suspected meningioma" that "[t]here are no symptoms referable to this lesion," that her complaint of memory issues "are likely related to a pseudodementia which ha[s] been previously diagnosed . . . ," and that "[t]here are no other new neurological symptoms." (Doc. 7, p. 972) Finally, Dr. Franchise clinical note characterized plaintiff's memory complaint as a "[m]ild memory disturbance." (Doc. 7, p. 973)(bold omitted)

Plaintiff has included in the record a letter from psychologist Roy Bilbrey, Ph.D., to attorney Donna Simpson dated July 21, 2014. (Doc. 7, p. 976) Dr. Bilbrey's diagnoses of plaintiff's conditions were "[g]eneralized [a]nxiety [d]isorder and [m]ajor depressive disorder. (Doc. 7, p. 976)

## B. Testimonial Evidence

The following colloquy occurred between the ALJ and plaintiff at the hearing concerning her alleged arthritis and back problems:

Q      . . . . [I]s there anything, physically, that's affecting your ability to do your work?

A      This arm hurts all the time . . . just arthritis, I reckon; my lower back.

. . .

A      . . . .  I mean, it's nothing that I can't live with.  An ibuprofen'll - - you know. . . .

. . .

Q      Okay.  And has the problem with . . . your back cause you difficulty with lifting?

A      My back, yes.

Q      And would you describe what problems you're having with your back?

A      It's just low.  It's like a dull ache all the time. Sometimes, it . . . runs up . . . more so to this side.

. . .

Q      . . . . [D]o you take anything to control that?

A      The ibuprofen.

Q      And does that keep the back pain under control?

A      Yes, pretty much.  I mean, there's always an ache, but nothing that - - yes.

(Doc. 7, pp. 47, 49)

## III.  ANALYSIS

### A.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The ALJ made the following RFC assessment in determining that plaintiff was capable of performing light work:

> . . . . [C]laimant has the residual functional capacity to perform *light* work as defined in 20 CFR 404.1567(b) except that she should avoid heights and hazards; is limited to occasional reaching overhead; should avoid climbing of scaffolds; and is limited to occasional balancing, stooping, kneeling, crouching, and crawling. She is able to perform simple one- to three-step tasks. She should avoid interaction with the general public and is limited to occasional interaction with co-workers. She can adapt to occasional changes in the workplace.

(Doc. 7, p. 20)(italics and underline in the original)

## B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003).  The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion.  *Gayheart*, 710 F.3d at 374.

### C.  Claims of Error

#### 1.  Whether the ALJ Gave the Appropriate Weight to the Report of Dr. Kimberly Eakle, M.D. (Doc. 12, pp. 10-14))

Plaintiff argues that the ALJ gave Dr. Eakle's MSS too little weight.[14]  As noted above at p. 5 n. 10, Dr. Eakle was a treating physician under the regulations.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques,'" and the opinion "'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2).  However, the ALJ "is not bound by a treating source's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994).  That said, the ALJ is required to provide "good reasons" for discounting the weight given to a treating-source's opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2).  The reasons must be "'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The ALJ's decision to give the MSS completed by Dr. Eakle little weight is quoted below

---

[14]  Plaintiff does not specify whether the first or the second MSS is at issue.  Because the substance of the first MSS is repeated in the second MSS, the Magistrate Judge will address only the second MSS.

in its entirety:

> Little weight has been given to the functional assessments articulated by treating internal medicine specialist Kimberly Y. Eakle-Gerald, M.D., who has essentially assessed that the claimant is limited to less-than-sedentary work (Exhibits 29F and 30F). Dr. Eakle-Gerald's assessments are inconsistent with the record as a whole. Again, the September 26, 2012, physical examination of Deka Efobi, M.D., a Board Certified Neurologist, was entirely normal. (Exhibit 24F). The musculoskeletal examination was entirely normal with no misalignment, asymmetry, crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy, or abnormal strength or tone (Id. at 2). Motor strength was intact at 5/5 in the bilateral upper and lower extremities, and motor tone was normal (Id.). Reflexes were normal a 2+ bilaterally in the upper and lower extremities (Id.). Gait and station were normal with the claimant demonstrating the ability to tandem walk, toe and heel walk, and stand on alternate limbs (Id.).

(Doc. 7, pp. 21-22) As shown above, the ALJ's reason was a good one. The next question is whether the ALJ's reason is supported by the evidence in the record.

As noted above at p. 7, Dr. Eakle wrote the following to explain the exertional limitations boxes she checked in the second MSS: "Memory loss – MRI, new evaluation," and "OA [osteoarthritis] – plain [sic] C[cervical]spine." Given that Dr. Eakle wrote the second MSS on March 12, 2013, it is apparent that the "MRI, new evaluation" to which she refers is the brain MRI ordered by Dr. Laccheo on January 10, 2013. In his January 11, 2013 letter to plaintiff, Dr. Laccheo wrote, *inter alia*, the January 10, 2013 "MRI of the brain . . . did not show any acute abnormality other than those previously seen . . . ." As previously noted, the brain MRI performed at St. Thomas in December 2011 revealed issues "most consistent with small vessel disease in a patient of [plaintiff's] age, but "[o]therwise [a] negative noncontrast MRI brain," and the brain MRI at Cookeville Regional that same month revealed "[n]o acute intracranial pathology."

As shown above, the "MRI, new evaluation" to which Dr. Eakle refers does not support her

check-box responses to the exertional limitations in the second MSS. There also is other substantial evidence that runs contrary to Dr. Eakle's assessed limitations. In reviewing the previous MRIs, Dr. Ngo saw only "[m]inimal chronic microvascular changes," he did not "appreciate the right subfrontal memingioma," he saw "no lesion with significant mass effect," he did "not appreciate the presence of a brain tumor on her MRI," and he concluded that plaintiff had a "significant underlying anxiety disorder" rather than "dementia of the Alzheimer type." Dr. Solomon opined that plaintiff had "pseudodementia, multifactorial in nature." Moreover, yet another brain MRI in December 2013 ordered by Dr. Lafranchise revealed no "significant change" from the minimal abnormalities noted in the previous brain MRIs.

Turning next to Dr. Eakle's "OA [osteoarthritis] – plain [*sic*] Cspine" explanation for the exertional limitations assessed, there is no objective medical evidence in the record that establishes plaintiff has osteoarthritis of the cervical spine. The record shows that Dr. Eakle's treatment notes that refer to plaintiff's alleged back pain are based solely on plaintiff's subjective representations. (Doc. 7, pp. 483, 618, 622, 782, 792, 870, 965) The several consulting doctors during the relevant period, *i.e.*, Drs. Gaume, Efobi, Laccheo, and Lafranchise, also base their arthritis/back-related observations either on plaintiff's subjective complaints and/or records that they reviewed. (Doc. 7, pp. 627-28, 702, 751-52, 834-35, 838, 947-48, 962)

"[T]he ALJ is not required to simply accept the [opinion] of a medical [source] based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 Fed.Appx.555, 564 (6th Cir. 2014)(citing 20 C.F.R. § 416.927(b) and *Bell v. Barnhart*, 148 Fed.Appx. 277, 285 (6th Cir. 2005)(declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms)). Even assuming for the sake of argument that plaintiff does have unverified

osteoarthritis of the cervical spine, as discussed above at p. 9, it can be inferred from her testimony that she can live with her back pain if she takes Ibuprofen.

The Magistrate Judge turns next to Dr. Eakle's explanation of her check-box responses to environmental limitations in the second MSS where she wrote the following to explain/support her environmental limitations: "OCC [occasional] exacerbation requires sedatory [*sic*] meds (Flexeril, Lortab that hinder work capacity)[.] Also issues [*sic*] c [with] memory affect[s] ability. Sx [symptoms] cont[inue] to worsen and mobility declining." Paragraph 14 in the environmental limitations section of the MSS instructed Dr. Eakle to "[d]escribe how the environmental factors" listed "impair activities and identify hazards to be avoided . . . [and] . . . [w]hat medical/clinical findings support your conclusions."

Dr. Eakle failed to explain how the environmental factors listed impair plaintiff's activities. There is on the one hand the obvious link between one's need to avoid hazards such as machinery and heights if taking pain medication and muscle relaxers. That makes perfect sense – and the ALJ included avoiding "heights and hazards" in her RFC assessment. On the other hand, the Magistrate Judge is at a loss to see any link between plaintiff's occasional need to take pain medications and muscle relaxers and the need to avoid concentrated exposure to extreme cold and heat, moderate exposure to noise, dust, humidity and wetness, and all exposure to fumes, odors, dusts, gasses, perfumes, solvents and/or cleaners, cigarette smoke, and chemicals. In short, not only is Dr. Eakle's explanation inapposite to these other listed environmental factors to which her explanation is intended to pertain, Dr. Eakle's explanation does not address how these other environmental factors impair plaintiff's activities due to the effect that those factors would have on plaintiff due to the medications she takes.

As for the requirement to identify the medical/clinical findings that supported her opinions,

a plain reading of Dr. Eakle's explanation shows that the only medical/clinical findings on which she relies are encompassed in her vague reference to plaintiff's medications. The medical records show that plaintiff was taking one or more of the following medications at various times during the period at issue: Irbesartan (high blood pressure), Esomeprazole (gastroesophageal reflux disease (GERD)), Sertraline antidepressant), Amlodipine (high blood pressure), Namenda (dementia), Exelon (dementia), Viibryd (antidepressant), Prozac (antidepressant), and Ibuprofen (arthritis and back pain).[15] (Doc. 7, pp. 622, 779, 782, 785, 791, 794, 862, 864-65, 867, 954) To the extent that antidepressants, dementia medications, and Ibuprofen can be construed as pain medications and/or muscle relaxers, the ALJ took plaintiff's use of these medications into consideration in the "heights and hazards" limitations in the RFC. Consequently, these medications do not support plaintiff's argument. That leaves Irbesartan, Esomeprazole, and Amlodipine – blood pressure and GERD medications. Plaintiff noted in her September 21, 2012 disability report on appeal that Esomeprazole gave her headaches, but that Irbesartan and Amlodipine had no side effects. (Doc. 7, p. 199) In short, there is nothing explicit or implied in the record that would support the conclusion that the other listed environmental factors would inhibit plaintiff's activities due to these medications.

Dr. Eakle writes next that plaintiff's alleged issues with memory problems affect her ability to work. It is worth repeating here that the second MSS – as well as the first MSS – is a physical MSS, not a mental MSS. Therefore, Dr. Eakle's memory-related opinion in the second MSS must be based on physical conditions/symptoms, not a mental/psychological conditions/symptoms. Dr. Eakle is an internal medicine specialist. Any opinion she might offer pertaining to plaintiff's memory based on mental/psychological conditions/symptoms is outside her realm of expertise and,

---

[15] Online research provided the uses indicated for the medications listed.

as such, not entitled to any specific weight. Assuming for the sake of argument that Dr. Eakle's vague explanation concerning plaintiff's memory is based on alleged physical conditions/symptoms, here too the record reveals that Dr. Eakle's assessments/diagnoses in her clinical notes all are based on plaintiff's subjective representations. As previously established, the ALJ is not required to accept a medical source's opinion based solely on a claimant's self-reported symptoms.

In addition to the foregoing, there also is substantial evidence on the record that plaintiff's alleged memory problems were not as severe as Dr. Eakle opined and/or that the alleged problems were not a physical issue, but rather a psychological/mental one. Dr. Galbraith noted that plaintiff exhibited only moderate problems in her short term memory, but no defect in her mid- to long-term memory, and documented numerous ALDs that demonstrated plaintiff was not memory limited. Dr. Efobi noted that plaintiff's recent memory was "preserved," and her remote memory was "intact." Dr. Ngo opined that plaintiff's recent and remote memory were "fairly good," noting that her memory problems were likely due to some "significant underlying anxiety disorder." Dr. Solomon concluded that plaintiff's alleged condition/symptoms were caused by pseudodementia, *i.e.*, other medical or psychological factors that mimic dementia-like symptoms. Additionally, although the second MSS is a physical MSS, it is worth noting that Dr. Joslin determined in her mental RFC that plaintiff's understanding and memory were not significantly limited, and Dr. Kupstas assessed plaintiff with moderate limitations in her ability to understand and remember detailed instructions, but otherwise she was not significantly limited in her understanding and memory.

Lastly, there is Dr. Eakle's statement in the second MSS that plaintiff's mobility is declining. Once again, a review of the record reveals that Dr. Eakle's opinion is based solely on plaintiff's subjective representations. On the other hand, there is substantial evidence that plaintiff's mobility was not compromised. Dr. Galbraith noted that plaintiff "displayed normal gait," and that she

admitted being able to do household chores, and yard work if needed. Dr. Efobi reported that plaintiff had no musculoskeletal defects, tenderness, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck spine, ribs, or pelvis. Dr. Efobi noted further that plaintiff's motor strength was 5/5 bilaterally in both upper and lower extremities, her reflexes were 2+ bilaterally in the upper and lower extremities, that she was able to tandem walk, toe and heal walk, and stand on alternate limbs. Dr. Ngo noted that plaintiff's "station, coordination, and gait we[re] intact." Dr. Laccheo reported that plaintiff's "motor exam power [was] 5/5 bilaterally. Tremors: absent. . . . Gait and station: within normal limits. Difficulty with tandem/heel walk, but able to walk on toes. . . . Involuntary movements: none." Dr. Lafranchise reported the following: "Muscle bulk: normal, without atrophy or fasciculations. Tone normal. Motor exam power 5/5 bilaterally. . . . Reflexes 2/2 bilaterally. . . . Tremors: absent. . . . Gait and station: within normal limits, walks in tandem. Involuntary movements: none."

As shown above, the ALJ gave good reasons for giving Dr. Eakle's opinion little weight, those reasons are supported by substantial evidence on the record, and the ALJ's explanation was sufficiently specific that both plaintiff and subsequent reviewers would understand the basis for that decision. Plaintiff's first claim of error is without merit.

## 2. Whether the ALJ Erred in Not Discussing the
## Side Effects of Plaintiff's Medications
## (Doc. 12, p. 14)

Plaintiff argues that the ALJ made no finding concerning the side effects of her medications, *i.e.*, that the ALJ did not address that plaintiff reported to Dr. Eakle on May 31, 2013 that "her medications made her feel drugged and angry . . . ." Plaintiff asserts that the ALJ "erred in her failure to discuss these **significant** side effects." (bold added)

The ALJ is required to consider "[t]he type, dosage, effectiveness, and side effects of any

medication . . . taken to alleviate . . . pain or other symptoms . . . ."  20 C.F.R. 404.1529(c)(3)(iv); SSR 96-7P, 1996 WL 374186 * 3 (Jul 2, 1996).[16]  Allegations of a medication's side effects must be supported by objective medical evidence.  *See Essary v. Comm'r of Soc. Sec.,*  114 Fed.Appx. 662, 665-66 (6th Cir. 2004).  Failure to consider the side effects of medications is subject to harmless error analysis.  *See e.g., Tennant v. Comm'r of Soc. Sec.*, Slip Copy 2016 WL 5799164 * 5 (W.D. Mich. Oct. 5, 2016).

The record shows that Dr. Eakle prescribed Viibryd – an antidepressant and the medication to which plaintiff refers – on May 15, 2013.  (Doc. 7, p. 867)  Plaintiff complained to Dr. Eakle two weeks later on May 31, 2013 that the Viibryd made her "feel drugged and angry."  (Doc. 7, p. 862)  Dr. Eakle took plaintiff off Viibryd that same day, and prescribed Prozac in its place.  (Doc. 7, p. 864)  The record shows that plaintiff tolerated Prozac well, and that she never complained of any side effects from Prozac.

The record shows that the ALJ did not address the negative side of effects of Viibryd in her decision.  The Viibryd incident lasted a mere two weeks during the two-plus year period represented by the medical record, and the problem was rectified immediately.  In short, the ALJ's failure to address the Viibryd incident was harmless because consideration of this brief, one-time event would not have altered the outcome of the proceedings below.  Plaintiff's second claim of error is without merit.

### 3.  Whether the ALJ Erred in His Assessment of Plaintiff's Credibility (Doc. 12, pp. 14-15)

Plaintiff argues that the ALJ erred in her credibility assessment by arguing that plaintiff "still

---

[16]  SSR 16-3p superseded SSR 96-7p on March 16, 2016.  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  "SSR 16-3p 'eliminat[es] the use of the term 'credibility' . . . to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'"  *Dooley v. Comm'r of Soc. Sec.*, 656 Fed.Appx. 113 * 5 n. 1 (6th Cir. 2016).

played Bingo," whereas the adult function report showed that plaintiff "played "Bunko."  Plaintiff also asserts that the ALJ erred in giving too much weight to plaintiff's ability to perform "some minimal household tasks," *i.e.*, "'a little cleaning,'" paying bills, and some cooking.

Credibility determinations regarding an applicant's subjective complaints rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 Fed.Appx. 748, 755 (6th Cir. 2012).  An ALJ's credibility assessment will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Indeed, the Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'"  *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(citing *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)).  Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186 (SSA).

The ALJ determined that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not credible to the extent that they [we]re inconsistent" with the RFC assessment.  The ALJ's findings related to plaintiff's credibility included the following inconsistencies: 1) her complaint of left shoulder impairment to Dr. Efobi when her actual claim pertained to her right shoulder; 2) her assertion in the adult function report that she was unable to sit or stand for any length of time and her admission that she still goes outside and walks around, drives, goes camping and plays bingo; 3) her claim of memory problems and her admission that she could drive and go out alone if it were not for her husband; 4) her assertion in the adult function report that she needed help/reminders taking her medicine, as well as other memory problems, and

her report to Dr. Galbraith that she managed her own medications without difficulty; 5) her assertion in the adult function report that she was unable to pay bills or handle savings/checking accounts and her admission to Dr. Galbraith that she managed her finances with little or no difficulty; 6) her assertion in the adult function report that she was unable to prepare her own meals and her admission to Dr. Galbraith that she was able to prepare meals; 7) her ability to provide for her own self-care and personal hygiene, 8) the many other ADLs plaintiff's admitted to being able to perform; 9) her statement in the initial disability report that she stopped working because of her medical condition and her admission at the hearing that her former employer's business had been slowing down; 10) evidence that plaintiff began working part time due to poor work motivation; 11) unpersuasive appearance and demeanor at the hearing, *i.e.*, plaintiff showed no pain or discomfort at the hearing. (Doc. 7, pp. 21, 23-25)

The inconsistences enumerated above are supported by the record, either as discussed in the Medical Evidence section of this R&R, or by the direct references to the record made by the ALJ in her decision. There also is other evidence on the record that supports the ALJ's credibility decision. First, plaintiff told Dr. Gaume on July 25, 2012 that she did not get lost while driving. Twelve days later, on August 6, 2012, she told Dr. Galbraith that she did get lost driving, and had to call her husband for help at least once a week. Second, plaintiff told Dr. Efobi on November 6, 2012 that she was experiencing back pain because she tripped over a broom the week prior and hurt her back. Plaintiff told Dr. Laccheo two months later that she fell a few months ago because she felt "off balance." Finally, Dr. Solomon suggested strongly several times in his report that plaintiff misrepresented/exaggerated her condition/symptoms during his examination.

As shown above, the ALJ's credibility assessment contained specific reasons, her assessment is supported by the record, and the explanation given for that assessment makes it sufficiently clear

to plaintiff and subsequent reviewers as to the reasons for that assessment. Plaintiff's third claim of error is without merit.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 11) be **DENIED**, and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 15th day of December, 2016.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge